| | |
|---|---|
| DENNIS RIVERO, | ) |
| | ) |
| Plaintiff, | ) |
| | ) No. 04 C 6514 |
| v. | ) |
| | ) Judge John W. Darrah |
| UNITED AIRLINES, INC., | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

Plaintiff, Dennis Rivero, filed suit against Defendant, United Airlines, Inc., alleging violations of the Family Medical Leave Act of 1993, 29 U.S.C. § 2601, *et seq.* ("FMLA"); discrimination on the basis of national origin under 42 U.S.C. § 1981; and Title VII of the Civil Rights Acts of 1964. Presently pending before the Court is Defendant's Motion for Summary Judgment.

## BACKGROUND

United is engaged in the business of air transportation. (Def.'s 56.1(a)(3) Statement ¶ 3). Rivero, was born in Los Angeles, California, and moved to Puerto Rico when he was three months old. Rivero moved from Puerto Rico to Miami fourteen years ago. (Id., ¶ 4). Rivero was employed as a flight attendant from January 8, 1995, through December 22, 2003. (Plaint.'s 56.1(a)(3) Statement ¶ 1). As a flight attendant, Rivero was employed in United's Onboard Services Division. (Def.'s 56.1(a)(3) Statement ¶ 5). The Onboard Services Division is responsible for the management of United's flight attendants.

United has a policy that forbids "harassment and discrimination based on race, color, sex, age, religion, national origin, disability, veteran status, or sexual orientation." (Def.'s 56.1(a)(3)

Statement ¶ 8). United also forbids retaliation against any individual "for making a good faith claim of harassment or discrimination, opposing harassment or discrimination, or participating in or assisting with an investigation of harassment or discrimination." (Id., ¶ 9). United requires employees to report harassment or discrimination and provides employees numerous channels to report harassment, discrimination or retaliation. (Id., ¶ 10). United also has an Equitable Treatment policy that provides, in pertinent part:

> United is dedicated to the goal of providing for equal employment opportunity without regard to race, color, sex, national origin, age, religion, disability, veteran status, sexual orientation or other protected characteristics. Equal employment opportunity applies to all aspects of employment, from hiring through termination . . . .

(Id., ¶ 11).

United also has a Flight Attendant Medical Benefits Plan that provides medical and dental benefits to a qualifying domestic partner. (Def.'s 56.1(a)(3) Statement ¶ 19). A qualified domestic partner is established by "a written Employer-approved affidavit of domestic partnership signed by both [the employee] and [his/her] domestic partner, with supporting documentation." (Id., ¶ 20).

United has a "United Airlines Flight Attendant Family & Medical Leave Policy," ("United FML"), which was in effect while Rivero was employed by United. (Def.'s 56.1(a)(3) Statement ¶ 13). United provides the benefit of family and medical leave to its flight attendants under this policy because it believes that the flight attendants do not qualify for leave under the FMLA. United believes that the flight attendants do not qualify for leave under the FMLA because it believes that the flight attendants do not meet the requisite number of hours required for the FMLA to apply. (Id., ¶ 14).

2

The United FML policy provides, in pertinent part:

> As flight attendants do not work the minimum of 1250 hours in a twelve-month period, they are not eligible for benefits under the Federal Family and Medical Leave Act of 1993. Because of that, the Onboard Division introduced a Family Medical Leave Policy for Flight Attendants in February, 1994. This policy provides mostly similar benefits to the Act of 1993, but will in certain instances differ slightly due to such requirements as compliance with the terms of your Collective Bargaining Agreement.

(Id., ¶ 16). The Collective Bargaining Agreement ("CBA") allows flight attendants to work 255 "Flight Time" hours per quarter; with four quarters per year, the total amount provided in the CBA is 1,020 hours. (Id., ¶ 17; CBA Section 7A). In addition to flight hours, flight attendants also have duty hours. Duty hours include time spent pre-and post-flight. (Def.'s 56.1(a)(3) Statement ¶ 48). From September 1, 2002, through September 30, 2003, Rivero's duty hours totaled 1,221:45. (Id., ¶ 49). Rivero opines that he spent at least forty hours in other "work" for United, including time he spent at the airport on layovers where he was not debriefed, time spent commuting to his domicile, time spent in training, and time spent waiting for airplanes that were eventually cancelled. (Plaint.'s 56.1(b)(3) Statement ¶ 30).

The flight attendants' Operations Manual contains the Articles of Conduct – the rules that govern the flight attendants' employment. (Def.'s 56.1(a)(3) Statement ¶ 21). Flight attendants are required to keep the Articles of Conduct and the Operations Manual with them at all times while they are working. (Id., ¶ 22). Flight attendants are also required to keep their Operations Manual current. (Id., ¶ 23).

Articles of Conduct, Rule 6, prohibits flight attendants from "[f]alsely claiming sick, occupational or other paid leave or worker's compensation benefits or furnishing false information

3

concerning absence." (Def.'s 56.1(a)(3) Statement ¶ 24). Falsely claiming sick leave can result in disciplinary action up to and including discharge. (Id., ¶ 25). Additionally, the Work Ethics Policy requires that employees not abuse or compromise their employee benefits. The Employee Dependability Policy also provides that flight attendants are entitled to use sick leave when they are sick but not when they are well enough to be at work. (Id., ¶ 27). If an employee is on sick leave or listed on the "sick list," the flight attendant needs to call the service center to be removed from sick leave or the sick list. (Id., ¶ 37).

Fligh attendants are sometimes scheduled "on reserve." To be "on reserve" means that the flight attendant must be able and ready to work at 12:01 a.m. on the day(s) they are on reserve. (Def.'s 56.1(a)(3) Statement ¶ 28). If a flight attendant is either scheduled to work or on reserve and then scheduled to work but does not, he or she receives a "did not fly" ("DNF"). (Id., ¶ 29). When a flight attendant receives a DNF, he or she does not receive payment for that day. (Id., ¶ 30). If a flight attendant is on reserve but not assigned to a flight, then he or she would not receive a DNF and would receive payment for that day. (Id., ¶ 31). A DNF is reported to a supervisor; and the supervisor, at his or her discretion, determines what level of discipline should be implemented. (Id., ¶¶ 32, 34). A crew scheduler does not handle any discipline. (Id., ¶ 33).

United also has a guideline for commuting flight attendants. The guideline provides that commuting flight attendants must have a minimum of a primary and secondary flight, both of which are scheduled to arrive prior to report time and the initial scheduled flight. (Plaint.'s 56.1(b)(3) Statement ¶ 12).

4

Rivero signed a Terms and Conditions of Employment on January 8, 1995. (Def.'s 56.1(a)(3) Statement ¶ 39). In signing the document, Rivero agreed that he would comply with United's rules and regulations. (Id., ¶ 40). Rivero was first assigned to the San Francisco domicile. In September or October 1995, Rivero transferred to the Miami domicile. (Id., ¶ 41). Rivero remained in the Miami domicile until he was furloughed out of Miami because the Miami domicile closed. Because of the furlough, Rivero transferred to the Chicago domicile on August 1, 2003. (Id., ¶ 42).

In May 2000, Rivero submitted a "United Airlines, Inc. Employee and Retiree Affidavit of Domestic Partnership." (Def.'s 56.1(a)(3) Statement ¶ 192). In the Affidavit, Rivero and his domestic partner at the time swore under oath that they "reside in the same household as the other person." (Id., ¶ 193). Rivero elected medical, dental, and travel benefits for his domestic partner. (Id., ¶ 195). In October 2002, Rivero changed the election to only include medical and dental benefits. (Id., ¶ 196). In November 2002, Rivero changed the election to include medical, dental, and travel benefits. (Id., ¶ 197). On December 15, 2002, Rivero terminated the elected benefits for his domestic partner. (Id., ¶ 198). In his April 19, 2005 deposition, Rivero testified that aside from a "friend" living with him in 2001, he has always lived by himself in the house that he owned since approximately May 2000. (Id., ¶ 200).

In June 2003, Rivero submitted a request for medical leave under United's flight attendant's United FML policy. (Def.'s 56.1(a)(3) Statement ¶ 50). On June 2, 2003, Rivero's doctor completed the Certification of Health Care Provider form, which was required to qualify for leave under United's FML policy. (Id., ¶ 51). The form stated that Rivero suffers from Severe Solar Elastosis and Actinic Keratoses. (Id., ¶ 52). The condition causes a rash. In order to prevent the rash, Rivero needs to avoid sunlight and apply medications. (Id., ¶¶ 53-56). On June 2, 2003,

5

United's physician, Dr. Robert McGuffin, approved Rivero's United FML leave for "One Treatment Visit Every Three Months." (Id., ¶ 57). Rivero never received notice that he was approved for any other type of leave pursuant to the United FML policy. (Id., ¶ 58).

Vicki Hammer, an Onboard Services Supervisor, began supervising Rivero after his transfer to the Chicago domicile. (Def.'s 56.1(a)(3) Statement ¶ 7). On August 1, 2003, an orientation meeting at the Chicago domicile was scheduled for the Miami flight attendants who were transferred to the Chicago domicile. (Id., ¶ 43). Rivero did not attend the orientation meeting. (Id., ¶ 44). On August 2, 2003, Hammer sent Rivero an e-note, asking him to explain why he missed the orientation meeting. (Id., ¶ 45). On August 3, 2003, Rivero responded that no one told him about the meeting. (Id., ¶ 46). Hammer did not discipline Rivero for missing the meeting. (Id., ¶ 47).

On September 16, 2003, Rivero had a treatment visit with his physician. (Def.'s 56.1(a)(3) Statement ¶ 59). On September 24, 2003, Rivero called his physician and told him that he felt that he had a rash on his face. Rivero's doctor told Rivero to avoid the sun and that if the rash got worse, he should not go to work and should apply medication. (Id., ¶ 109).

Beginning September 25 through September 27, 2003, Rivero was "on reserve." (Def.'s 56.1(a)(3) Statement ¶ 64). Because Rivero was domiciled in Chicago at this time, any flights to which he would have been assigned would have initiated out of Chicago. (Id., ¶ 65). To be able and ready to work, Rivero would have to be at the Chicago O'Hare Airport in time to work his assigned flight. A flight could have been assigned as early as 12:01 a.m. that day. (Id., ¶ 66).

The morning of September 25, 2003, Rivero was in Miami. (Def.'s 56.1(a)(3) Statement ¶ 67). Rivero was aware that there are frequently problems which interfere with flights. (Id., ¶ 68). On September 25, 2003, Rivero was scheduled to be on a flight leaving Miami and bound for

6

O'Hare, Flight 854, which was scheduled to depart Miami at 7:10 a.m. (eastern time) and arrive in Chicago at 9:19 a.m. (central time). (Id., ¶ 69). Rivero checked himself in for Flight 854 at 6:23 a.m. local time. (Id., ¶ 70). At 6:45 a.m., Rivero logged into United's system while at the Miami Airport and checked the flight schedule for flights from Orlando to Chicago. (Id., ¶ 71). At 7:12 a.m., Rivero, who was still logged into United's system, also checked the schedule for Flight 854. (Id., ¶ 72).

At approximately 7:16 a.m., eastern time, Rivero received a call from Mark Johnson, the crew scheduler domiciled at O'Hare. (Def.'s 56.1(a)(3) Statement ¶ 73). When Johnson called Rivero, Johnson had assigned Rivero a flight leaving O'Hare at 11:10 a.m., central time. (Id., ¶ 77). Rivero told Johnson that he was feeling sick. Johnson asked Rivero if he was taking the assignment; and, if not, Johnson would have to put him on the sick list. Rivero stated, "Just give me the I.D." (Id., ¶ 79). Rivero did not speak to Johnson again that day. (Id., ¶ 81). Johnson did not know Rivero's national origin at the time of the telephone call. (Id., ¶ 80).

Johnson's floor supervisor, on September 25, 2003, was Antonio Mitchell. (Def.'s 56.1(a)(3) Statement ¶ 82). Mitchell was responsible for managing, monitoring, and maintaining flight attendant schedules. If Mitchell had an issue with a flight attendant, he would speak to Vicki Hammer. (Id., ¶ 85). Mitchell overheard Johnson's side of Johnson's conversation with Rivero. At that time, Mitchell did not know the identity of the flight attendant on the other end of the phone. (Id., ¶ 86).

After speaking to Johnson, Rivero went to the ticket counter and was informed that Flight 854 was delayed. (Def.'s 56.1(a)(3) Statement ¶ 88). When he found out that the flight was delayed, Rivero logged into the system to check the schedule for any other available flights that would take

7

him to O'Hare in time for the 11:10 a.m. check-in. (Id., ¶ 89). Rivero went to the American Airlines terminal because he also had flight benefits with American Airlines. (Id., ¶ 90). On the way to the American Airlines terminal, Rivero went into the restroom and noticed that a rash on his face "got worse"; and he decided to call in sick. (Id., ¶ 91). Until he looked into the mirror, Rivero did not know that his skin condition had worsened. (Id., ¶ 92).

At 7:38 a.m., eastern time, Rivero called the service center and put himself on the sick list because his face "was bad." (Def.'s 56.1(a)(3) Statement ¶ 93). Rivero drove himself home, arriving at his home at approximately 8:00 a.m., eastern time. (Id., ¶¶ 96, 98). Once he arrived home, Rivero applied medication, stayed home, and "probably" watched television. (Id., ¶ 100). Rivero did not see his doctor that day. (Id., ¶ 102).

Shortly after his conversation with Rivero, Johnson learned that Rivero called in sick by a print out that showed Rivero had placed himself on the sick list. (Def.'s 56.1(a)(3) Statement ¶ 94). Johnson informed Mitchell that the person he had just been speaking to called in sick. (Id., ¶ 95). Johnson also informed Hammer that a flight attendant was given an assignment, accepted the assignment, and then called in sick. (Id., ¶ 115). Hammer asked Johnson to provide a statement about Johnson's conversation with Rivero. (Id., ¶ 116). That same day, Johnson provided Hammer with his statement. (Id., ¶ 118). Johnson's statement provided:

> At 6:16 a.m. [central time] on September 25, 2003, I called FA Dennis Rivero at phone number . . . he sounded as if I just woke him. I told him about his assignment ID 1431 with a 11:10 am check in. At that time he told me he would not be able to make it due to a flight problem, I then told him that I would have to DNF him. Then he told me no, "I am going to call ONSL", I warned him that if he called ONSL that I would have to advise his supervisor. He then asked me if I could just look the other way on this or give him a later check in. I told him no because it would not be fair to the other people who

8

> took DNF due to unable to commute. After I explained the situation
> again, he then said he would take the trip, then the conversation
> ended.

(Id., ¶ 120).

Later, Hammer learned that Mitchell had overheard Johnson's conversation with Rivero and

asked Mitchell to write a statement. (Def.'s 56.1(a)(3) Statement ¶¶ 122-24).

On September 25, 2003, Mitchell prepared the following statement:

> At approximately 6:15 a.m Crew Scheduler Mark Johnson attempted
> to give FA Dennis Rivero . . . an 11:10 check in assignment. I then
> heard Mr. Johnson explain that if Mr. Rivero could not make his
> flight he would have to show him DNF for the assignment. Then
> Mr. Johnson explained if you call in [sick] after being given an
> assignment we would be required to [electronically notify] his
> supervisor advising Mr. Rivero called in [sick] after telling
> Mr. Johnson he could not make his assignment because it would not
> be fair to other FA's who like him have commuting situations.
> Mr. Johnson then gave the assignment check in time again and the
> call ended. This witnessed by me in person, Mr. Johnson's
> explanation to Mr. Rivero pertaining to his assignment.

(Id., ¶ 126). After Mitchell gave Hammer his report, Hammer asked Mitchell if he knew Rivero.

Mitchell responded, "Not really. Not unless you can give me something specific." Hammer

responded, "Well he's a Puerto Rican flight attendant, dark hair." Mitchell then stated, "Well, that

still doesn't help, but here's the report." Hammer thanked Johnson, and the conversation ended.

(Id., ¶ 127).

That same day, Hammer e-mailed Tiffany Mihajlovic, the individual who took down the

information when Rivero called in sick. (Def.'s 56.1(a)(3) Statement ¶ 128). Mihajlovic responded

on September 26, 2003, that she had approved him for leave for "treatments" because that is for what

he was authorized. (Id., ¶ 129).

9

On September 26, 2003, while still on the sick list, Rivero again scheduled himself to leave Miami on Flight 854. (Def.'s 56.1(a)(3) Statement ¶ 103). Rivero checked in at 6:41 a.m., eastern time, and arrived at Chicago O'Hare at 9:30 a.m. Upon his arrival in Chicago, Rivero called off the sick list. (Id., ¶¶ 104-05). Because Rivero did not call off the sick list until 9:21 a.m. on September 26, 2003, he was paid for another family leave sick day. (Id., ¶ 106). Rivero flew to Chicago on September 26, 2003, even though he was still sick, in order to make sure that he was ready to work on September 27, 2003, a day he was also on reserve. (Id., ¶ 107). Rivero did receive an assignment and flew as scheduled on September 27, 2003. (Id., ¶ 109).

Rivero's rash lasted from Wednesday, September 24, 2003, until September 27-28, 2003. (Def.'s 56.1(a)(3) Statement ¶ 110). At Rivero's request, Rivero's physician provided United a clinical narrative on September 30, 2003. (Id., ¶ 111). In the narrative, Rivero's physician noted that Rivero had been on sick leave from September 25 to 26, 2003. He recommended that Rivero avoid the sun and apply his medication. He specified that Rivero was "[a]ble to perform regular duties starting: 9/26/03." (Id., ¶ 112).

Rivero visited his physician on October 6, 2003. (Def.'s 56.1(a)(3) Statement ¶ 113). Following the visit, Rivero's physician provided United another letter, dated October 17, 2003. The letter stated, in part:

> On September 24, Mr. Rivero called me at the office and notified me of a worsening of his facial actinic keratosis associated with some dermal abrasions, due to increase sunlight. We discussed the medical plan that I suggested my patient to avoid any sun light and to resume use of the medications we have previously used to improve his Actini Keratosis and Solar Elastosis. For this reason, and following my

medical recommendation Mr. Rivero called in sick for the day. I personally saw Mr. Rivero on October 6, 2003, for a medical follow-up. At the present time, his condition has improved.

(Id., ¶ 114).

A few days after September 25, 2003, Hammer spoke with Rivero about calling in sick on September 25, 2003. (Def.'s 56.1(a)(3) Statement ¶ 130). Hammer told Rivero that she had received statements from Johnson and Mitchell. (Id., ¶ 131). Hammer asked Rivero to prepare a written statement concerning that dates' events. (Id., ¶ 133). Hammer did not tell Rivero what to put into the statement. (Id., ¶ 134).

Rivero's September 27, 2003 statement provided:

> On Thursday, September 25 at 6:15 a.m. I got a call from the crew desk (Mark), giving me an assignment from that date, I did not accepted the assignment right away. The nite before I was not feeling well, and that Thursday I got a rash on my face and right arm. I was still feeling sick, I waited almost an hour to see if I was feeling better, but did not happened, so I called sick for that day.

(Def.'s 56.1(a)(3) Statement ¶ 136). Rivero met with Hammer a second time on either September 30 or October 1, 2003. (Id., ¶ 137; Plaint.'s Response ¶ 137). On October 1, 2003, Rivero wrote another statement:

> I am not absolutely familiar with the reserve procedure, they are kind of new to me. A lot of changes in the new contract lately, I don't even have a copy of it. Now I do understand that we are aloud to denied an assignment to the crew desk, if we are sick, that's why I took the assignment on September 25. I thought in the past that we were suppose to take the assignment, even though we were sick and then call the service center. Also you can verify that my relation with the crew desk is very good. I have never had any inconvenience, at the contrary I have helped them in a few situations in the past and its recall on my work history. I know that I was at the airport, and that United flight was delay, but I also know that I was sick. When heading to American Airlines I saw the rash on my face again and I

> knew the best thing to do was calling sick. Getting to ORD on the time before my trip was not a problem, I can prove that I have benefits on AA any time. I did not do anything wrong, I guess it was a misunderstanding of knowing procedures that I can do and not do about my flight attendant contract and new agreement.

(Id., ¶ 138).

Hammer shared Rivero's additional statement with Johnson; and on October 9, 2003, Johnson provided a second statement. Johnson's second statement provided:

> This letter is a rely for FA Dennis Rivero. This letter is to state the facts that happened on the day in question. ON September 25, 2003 I called FA Rivero at telephone number . . . . I do not know whether this was his home phone or cell number. I called him as 6:16 am, I told him that I had an assignment for him, then he told me right away that he could not make the flight due to an airplane problem. I did not look up any flights to see if was booked. I told him that he would get a DNF, he said no I am going [to take a sick day] as stated in the first letter. I then told him that he [calls in sick] I would have to report it to his supervisor. He then asked to look the other way or give him another assignment, I told him no because it wouldn't be fair to the other people who took DNF because they can't commute. After I repeated warned him about [calling in sick] he finally took the assignment. That when the conversation ended.

(Def.'s 56.1(a)(3) Statement ¶ 139). Mitchell also provided a second statement:

> This letter is to clarify in more detail the letter of September 25, 2003, involving the assignment given by Crew Desk Scheduler
> Mark Johnson to FA Dennis Rivero. On the morning of the 25th of September I was the Supervisor on duty. Mark Johnson was working the Reserve desk and he was responsible for calling out the open trips needing coverage for the day. At 6:15 am, Mark attempted to assign an open ID to FA Dennis Rivero. Standing outside my office at the table behind the reserve desk I heard Mark explain to Mr. Rivero the procedures required when a FA says they can not make their assignment. Mark explained that he would have to give him a DNF for not being able to make the assignment. Mark then began to explain to Mr. Rivero; if you call [in sick] after being given an assignment he would be required to [electronically notify] his supervisor advising that he called [in sick] after being given his

> assignment. This was repeated to him because it would not be fair to other commuters who have not been able to commute in. Mark then asked if he was excepting the assignment, gave him the information and ended the call. After the call I commented on how well Mark handled the call in giving a detailed explanation to Mr. Rivero of his options.

(Id., ¶ 140).

After consulting with Labor Relations, and because she suspected that Rivero had violated Article 6 – falsely claiming sick leave benefits or other paid leave – Hammer recommended that Rivero be placed on a paid leave pending an investigation. (Def.'s 56.1(a)(3) Statement ¶ 146). As of October 15, 2003, Rivero was removed from the work schedule and did not fly. (Id., ¶ 147).

On October 16, 2003, Rivero met with Hammer and wrote another statement. (Def.'s 56.1(a)(3) Statement ¶ 148). During the meeting, Hammer gave to Rivero the second statements of Johnson and Mitchell. (Id., ¶ 149). Hammer also gave Rivero written notice, dated October 16, 2003, that he needed to verify with United Medical the medical necessity of his absence from work on September 25, 2003. (Id., ¶ 150). Rivero's October 16, 2003 statement provided:

> On Oct. 16, I had a meeting with my supervisor, gave me again the letter from Mark and Antonio. Again Mark is saying that he called me home, the number that he called was my cell number, not my house number, I think he is confusing things in this case . . . . I always thought that when a crew scheduler give you an assignment, even thought you are sick, you suppose to take it and then call the service center. On my work history you can see that I always did the same, that was my understanding, until now I know that we are aloud to tell them that we are sick.

(Id., ¶ 151).

Hammer and Rivero again met on November 21, 2003. (Def.'s 56.1(a)(3) Statement ¶ 152). Rivero prepared a statement regarding the November 21, 2003 meeting. (Id., ¶ 153). In this

13

statement, Rivero restated some of the information he provided in his earlier statements and added: (1) Rivero asked Johnson for another assignment during the call; (2) Johnson said that he could not give Rivero another assignment so Rivero took the initial assignment; (3) Rivero may have mentioned that he was sick to Johnson; and (4) Rivero also provided information about his medical condition, but not at Hammer's request. (Id., ¶ 154).

On November 14, 2003, Hammer learned that Rivero called off sick at 9:21 a.m on September 26, 2003. (Def.'s 56.1(a)(3) ¶ 156). Because Rivero did not call off sick until 9:21 a.m. on September 26, 2003, he was paid for another family leave sick day while on reserve; and the crew desk could not use him to fly that day. (Id., ¶ 157).

On December 2, 2003, Rivero received a letter of charge from Hammer dated December 2, 2003. (Def.'s 56.1(a)(3) Statement ¶ 158). The letter informed Rivero that he was being charged with "failure to fulfill your responsibilities as a flight attendant, Article 6, in that: On September 25, 2003, you placed yourself on sick leave status and collected sick leave benefits for assigned ID 1431 on September 25-26, 2003, when you were not sick." (Id., ¶ 159).

On December 11, 2003, a hearing was conducted by Bonnie Sheil, Manager of Onboard Services, concerning the letter of charge and recommended discipline. (Def.'s 56.1(a)(3) Statement ¶ 160). At the hearing, Rivero was represented by a union representative. (Id., ¶ 161). Hammer and another supervisor represented United at the hearing. (Id., ¶ 162). On December 22, 2003, Rivero received a telephone call advising him that he was terminated, effective December 22, 2003. (Id., ¶ 163). Rivero also received a Letter of Decision, dated December 22, 2003, from Sheil. (Id., ¶ 164). The Letter of Decision informed Rivero that Sheil agreed with United that his "intent on September 25, 2003, was to report to work until [he] received the assignment that he was unable to

14

make, due to [his] delayed commuter flight, and to avoid a DNF, [he] falsely placed [himself] on family sick leave." (Id., ¶ 165). Rivero grieved his termination pursuant to the CBA grievance procedure. (Id., ¶ 166). The grievance procedure involved a mediation component, which Hammer did not take part in. (Id., ¶¶ 167-68).

Rivero's discharge is the only disciplinary action that Rivero was issued. (Plaint.'s 56.1(b)(3) Statement ¶ 3). In 1995, 1996, and 1997, Rivero received accolades while employed by United. (Id., ¶ 4).

Rivero believes that Hammer discriminated against him on the basis of his national origin. (Def.'s 56.1(a)(3) Statement ¶ 169). Rivero believes that Hammer knew he was not American because of his last name, his accent, and the fact that he transferred from Miami. (Id., ¶ 171). Rivero does not recall Hammer saying "Hi" to him when he would walk through the in-flight office but believes she said "Hi" to others. (Id., ¶¶ 173-74). Rivero also felt discriminated against because Hammer never mentioned anything when Rivero passed his Portuguese exam and because at the November 21, 2003 meeting, she stated, "Who [do] you people think you are? You're an ignorant." (Id., ¶¶ 176, 178).

Hammer issued letters of charge to other non-Hispanic flight attendants, including Aldenise Oliveria, Diane Luberda, and Richard Tramblay. (Def.'s 56.1(a)(3) Statement ¶¶ 179, 183, 188). Oliveria was charged with violating Article 6 because she claimed that she was on jury duty when, in fact, she was not and received jury duty benefits as a result. (Id., ¶ 180). In July 26, 2004, Oliveria was terminated for violating Articles 6, 21, and 30. (Id., ¶ 182). Luberda received a letter of charge because she lied about the reason for taking a DNF. (Id., ¶ 183). Subsequently, Luberda

15

was discharged. (Id., ¶ 186). Tramblay received a letter of charge alleging violations of Articles 8, 21, and 30 because he requested time off for a partner's memorial service that never occurred. (Id., ¶ 188). Tramblay was subsequently discharged. (Id., ¶ 190).

## ANALYSIS

Summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact." Fed R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-323 (1986) (*Celotex*). All of the evidence and the reasonable inferences that may be drawn from the evidence are viewed in the light most favorable to the nonmovant. *Miller v. American Family Mutual Ins.*, 203 F.3d 997, 1003 (7th Cir. 2000). Summary judgment may be granted when no "reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (*Anderson*). However, a party cannot defeat summary judgment by relying on unsubstantiated facts. *See Greer v. Board of Educ. of the City of Chicago*, 267 F.3d 723, 729 (7th Cir. 2001) (*Greer*).

### *National Origin Discrimination Claims under Title VII and Section 1981*

Rivero may prevail on his discrimination claims either through the "direct method" - showing intentional discrimination – or through the similar burden-shifting framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Blise v. Antaramian*, 409 F.3d 861, 866 (7th Cir. 2005) (*Blise*); *Bennett v. Roberts*, 295 F.3d 687, 697 (7th Cir. 2002) (same standard in a Title VII case applies to a Section 1981 claim). The direct method of proving discrimination requires the introduction of direct or circumstantial evidence of

16

discrimination. Direct evidence requires essentially an admission by the defendant that the action was based on a prohibited animus. *See Blise*, 409 F.3d at 866. Rivero does not present direct evidence.

A plaintiff may also proceed under the direct method by constructing a "convincing mosaic" of circumstantial evidence that a jury would infer to be intentional discrimination. The circumstantial evidence must point directly to a discriminatory reason for the adverse action. *See Blise*, 409 F.3d at 866. Here, Rivero believes that Hammer discriminated against him because of his national origin because he does not recall her saying "Hi" to him when he walked by. In addition, she made a discriminatory comment at the November 21, 2003 meeting: "Who [do] you people think you are? You're an ignorant." Hammer's failure to say "Hi" and her comment fail to point directly to a discriminatory reason for the adverse action. *See Bahl v. Royal Indem. Co.*, 115 F.3d 1283, 1293 (7th Cir. 1997) (derogatory comments do not evidence pretext to discrimination unless they are both proximate and related to the employment decision); *Schreiner v. Caterpillar, Inc.*, 250 F.3d 1096, 1099 (7th Cir. 2001) (stray remarks unrelated to the alleged discriminatory decision are not sufficient to establish an inference of discrimination).

Rivero primarily argues that he has established a *prima facie* case of national origin discrimination under the *McDonnell Douglas* framework. To establish a *prima facie* case, Rivero is required to demonstrate that: (1) he was a member of a protected class; (2) he was meeting his employer's legitimate performance expectations; (3) he suffered an adverse employment action; and (4) similarly-situated employees not in the protected class were treated more favorably. *Lalvani v. Cook County*, 269 F.3d 785, 789 (7th Cir. 2001) (*Lalvani*). If Rivero demonstrates a *prima facie* case, the burden shifts to United to demonstrate "a legitimate, nondiscriminatory reason for the

action." *Blise*, 409 F.3d at 867. If United meets this burden, the burden shifts back to Rivero to demonstrate the proffered reason is pretextual. *Blise*, 409 F.3d at 867.

Rivero has failed to establish that he was meeting his employer's legitimate performance expectations. Rivero was disciplined and eventually discharged for violating Rule 6 of Articles of Conduct by falsely placing himself on sick leave on September 25 after he had accepted an assignment and then determined he would not be able to make that assignment on time. The discipline and discharge were taken after an investigation and hearing into the events of September 25 and 26, 2003. While Rivero disputes United's decision to accept other employees' versions of the events on September 25, 2003, that does not create a genuine issue of fact as to whether United found Rivero was meeting its legitimate performance expectations.

In addition, Rivero cannot identify a similarly-situated employee not in the protected class who was treated more favorably. Rivero's supervisor, Hammer, similarly disciplined three other non-Hispanic flight attendants for providing false information to United in order to qualify for leave and/or leave benefits. Without such evidence of a similarly-situated co-worker treated more favorably, Rivero's claims fail. *Lalvani*, 269 F.3d at 790.

Even if Rivero could make a *prima facie* case of discrimination, he has not demonstrated that United's reason for taking action was pretextual. A plaintiff can establish pretext by showing that the employer's explanation is unworthy of credence or that a discriminatory reason more likely motivated the employer. *Debs v. Northeastern Illinois Univ.*, 153 F.3d 390, 395 (7th Cir. 1998) (*Debs*). Pretext in this context does not mean a mistake; rather, it means "a lie, specifically a phony reason for some action." *Russell v. Acme-Evans Co.*, 51 F.3d 64, 68 (7th Cir 1995). An honest

18

belief in the nondiscriminatory reason offered by the decision-maker will be sufficient even if the reasons are foolish, trivial, or even baseless. *Debs*, 153 F.3d at 396.

United has presented unrebutted evidence of a noninvidious reason for Rivero's discharge—his violation of Rule 6 of the Articles of Conduct. As stated above, Rivero was terminated after an investigation and hearing of the September 25 and 26, 2003 events. United, and specifically Hammer, has disciplined other non-Hispanics for similar misconduct, and their employment had also been terminated. Rivero has failed to demonstrate that United's proffered reason was a lie or a pretext for his discharge.

### *Family Medical Leave Act*

Rivero alleges that United retaliated against him, in violation of the FMLA, for taking sick leave. United argues that Rivero was not eligible for leave under the FMLA because he did not work the requisite 1,250 hours during the twelve-month period prior to the commencement of his desired leave.

The FMLA provides that, under certain circumstances, an employer must allow an eligible employee to take up to twelve work weeks of leave during any twelve-month period because of a serious health condition that prevents the employee from performing the functions of his position. 29 U.S.C. § 2612(a)(1)(D). The FMLA provides employees protection in the event they are discriminated against for exercising their rights under the FMLA. *See* 29 U.S.C. § 2615(a)(1) & (2); 29 C.F.R. § 825.220(c). An eligible employee is one who has worked for a covered employer for at least twelve months, has worked at least 1,250 hours during the previous twelve months, and has been employed at a worksite where there are at least fifty or more employees within a seventy-five mile radius. 29 U.S.C. § 2611(2)(A); 29 U.S.C. § 2611(2)(B)(ii). An employee must satisfy each

19

of these criteria independently to be eligible for FMLA leave. 29 C.F.R. § 825.110. Thus, an employee who has less than 1,250 hours of service in the previous twelve-month period is not entitled to the protections of the FMLA and may not maintain an action under the Act. 29 C.F.R. § 825.110.

To determine if an employee has the requisite 1,250 hours of service with his employer, the FMLA directs courts to examine the principles for calculating hours of service that have been established under the Fair Labor Standards Act ("FLSA"). 29 U.S.C. § 2611(2)(C); 29 C.F.R. § 825.110(c). The test for determining if an employee's time constitutes working time is whether the "time is spent predominantly for the employer's benefit or for the employee's." *Skidmore v. Swift & Co.*, 323 U.S. 134, 137 (1944); *Armour & Co. v. Wantock*, 323 U.S. 126, 133 (1944). That test requires consideration of the agreement of the parties, the nature and extent of the restrictions, the relationship between services rendered and on-call time, and all surrounding circumstances. *Skidmore*, 323 U.S. at 137. In other words, hours spent by an employee engaged in his principal work activities are considered to be hours worked under the FLSA. *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 690 (1946). However, "Periods during which an employee is completely relieved from duty and which are long enough to enable him to use the time effectively for his own purposes are not hours worked." 29 C.F.R. § 785.16. Whether a certain set of facts and circumstances constitutes work for purposes of the FLSA is a question of law. *Birdwell v. City of Gadsden*, 970 F.2d 802, 807 (11th Cir. 1992).

If "an employer does not maintain an accurate record of hours worked by an employee, including for employees who are exempt from FLSA's requirement that a record be kept of their hours worked . . . the employer has the burden of showing that the employee has not worked the

20

requisite hours." 29 C.F.R. § 825.110(c). In such cases, the employer must be able to clearly demonstrate that the subject employee did not work the 1,250 hours during the previous twelve months in order to claim that the employee is not eligible under the FMLA. 29 C.F.R. § 825.110(c).

It is undisputed that Rivero worked at least 1,221:45 hours the twelve months prior to the commencement of his leave. Rivero contends that it should be presumed that he worked the requisite number of hours because United failed to keep accurate records of all the hours he actually worked. Rivero contends that United failed to record: (1) time he was at an airport on layover where he was not debriefed, (2) time waiting for a plane that was delayed, and (3) time spent waiting for airplanes that were delayed. United contends that it kept accurate records, citing to a Labor Relation's employees declaration that Rivero worked 1,221:45 hours. However, the records of the hours worked by Rivero are not before the Court; and it cannot be determined whether the records accurately recorded all of the hours Rivero worked that are legally included in the computation of hours worked.

United also argues that Rivero's conclusory statement that he worked the number of required hours should not defeat summary judgment. United contends that the CBA makes clear that United adequately accounted "for much" of the additional time Rivero contends places him within 1,250 hours. The Court need not determine whether Rivero worked the required number of hours because his FMLA claim fails for other reasons, as discussed below.

In order for a claim to fall within the FMLA, the individual must suffer from a serious health condition. *See* 29 C.F.R. § 825.114. Whether a plaintiff's illness constitutes a serious health condition is a question of law to be determined by the court. *See Haefling v. United Parcel Service, Inc.*, 169 F.3d 494, 499 (7th Cir. 1999) (*Haefling*). A "serious health condition" includes an illness,

impairment or physical condition that requires continuing treatment by a health care provider if the illness, impairment or physical condition requires episodic rather than continuing periods of incapacitation. 29 C.F.R. § 825.114(a)(2)(iii)(C).

Here, Rivero's physician certified that Rivero suffered from Severe Solar Elastosis and Actinic Keratoses that caused a rash. In order to prevent the rash and the treatment if a rash occurred included avoiding the sun and applying medications. On September 24, 2003, Rivero's physician told Rivero that if his then-present rash worsened, he should not go to work. Rivero's physician also indicated in a later clinical narrative that Rivero was able to perform his regular duties as of September 26, 2003. Rivero presents no other medical evidence demonstrating that his condition caused episodic periods of incapacitation. *See* 29 C.F.R. § 825.114(a)(2)(iii)(C). Furthermore, Rivero's own actions demonstrate the lack of incapacitation. After he called in sick, Rivero drove himself home. The next day, while still experiencing some rash, Rivero flew to Chicago and took himself off the sick list. The next day, Rivero accepted and worked an assignment. Rivero concedes that his rash lasted until September 27 or 28, when he flew back to Chicago and worked. These undisputed facts fail to demonstrate that Rivero suffered from a serious medical condition that caused periodic incapacitation. *See Haefling*, 169 F.3d at 499-500 (plaintiff failed to show his injury caused incapacitation); *Bell v. Jewell Food Store*, 83 F. Supp. 2d 951, 959-60 (N.D. Ill. 2000) (plaintiff failed to demonstrate he was incapacitated on the dates he was unable to work). Rivero is not entitled to benefits under the FMLA, and his claim under the FMLA fails.

Even assuming that Rivero is entitled to FMLA benefits, Rivero's FMLA retaliation claim still fails.

22

A plaintiff may prove a FMLA retaliation claim either through the direct method - showing intentional discrimination – or through the similar burden-shifting framework established by the Supreme Court in *McDonnell Douglas. See Buie v. Quad/Graphics, Inc.*, 366 F.3d 496, 503 (7th Cir. 2004) (*Buie*). Rivero did not assert, and there is no evidence of, intentional discrimination based on Rivero's illness and use of sick leave. Accordingly, Rivero's claim is analyzed under the *McDonnell Douglas* burden-shifting framework. Under this method, Rivero must establish that after he engaged in a protected activity, only he, and not a similarly situated employee who did not engage in a protected activity, was subjected to an adverse employment action even though he was performing his position in a satisfactory manner. *See Buie*, 366 F.3d at 503-04. If Rivero can meet this test, he is entitled to summary judgment unless United presents unrebutted evidence of a noninvidious reason for Rivero's termination. If United presents such evidence, United is entitled to summary judgment. *See Buie*, 366 F.3d at 503-04.

As fully discussed above, Rivero has failed to establish that he was performing in a satisfactory manner; and United has presented unrebutted evidence of a noninvidious reason for Rivero's termination – his violation of Rule 6 of the Articles of Conduct.

## CONCLUSION

For the reasons stated above, United's Motion for Summary Judgment is granted.

Dated: _11-22-05_

JOHN W. DARRAH
United States District Judge

23